EXHIBIT A



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**May 29, 2021 20:54**

By: SUBODH CHANDRA 0069233

Confirmation Nbr. 2265701

JOHN T. SANDERS                    CV 21 948190

      vs.

CUYAHOGA COUNTY, ET AL.          **Judge:**  WILLIAM T. MCGINTY

**Pages Filed:**  23

EXHIBIT A

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **JOHN T. SANDERS**<br>222 Twin Oaks Road, Apt. 8<br>Akron, OH 44313<br><br>    Plaintiff,<br><br>  v.<br><br>**CUYAHOGA COUNTY**<br>c/o Cuyahoga County Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>**ARMOND BUDISH, Individually**<br>c/o Cuyahoga County Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>**CUYAHOGA COUNTY SHERIFF David G. Schilling, Jr., Individually**<br>1215 W. 3rd Street<br>Cleveland, OH 44113<br><br>**CUYAHOGA COUNTY SAFETY SERVICES DIRECTOR Shane Alex Pellom, Individually**<br>2079 East 9th Street, Suite 5-200<br>Cleveland, OH 44115<br><br>**DEPUTY SHERIFF Bruce Lourie, Individually**<br>c/o Cuyahoga County Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>**DEPUTY SHERIFF Juan Rodriguez, Jr., Individually**<br>c/o Cuyahoga County Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115 | Case No. _____<br><br>Judge _____ |

| **Defendant John Doe, Individually**<br>c/o Cuyahoga County Department of Law<br>2079 E. 9th Street<br>Cleveland, OH 44115<br><br>              Defendants. |  |
| --- | --- |

---

**COMPLAINT WITH JURY DEMAND**

---

## I.     NATURE OF ACTION

1.      This is a civil-rights action to address acts of unlawful violence, and violation of Plaintiff's constitutional rights to demonstrate, speak, and be free of unlawful and unjustified seizure. And although the sadistic actions of Deputy Sheriff Bruce Lourie were the immediate cause of Plaintiff's injury, the Cuyahoga County Sheriff's Department has for an extended period lacked any significant supervision by the Sheriff, Safety Services Director, or the County Executive, and therefore all are liable as well. This failure to supervise is the custom, policy, pattern, and practice of Cuyahoga County.

2.      Cuyahoga County Deputy Bruce Lourie, a troubled law-enforcement officer with a troubled career, sadistically shot John Sanders and others from an elevated perch of safety on the second floor of the Justice Center, during the May 30, 2020 Black Lives Matter protest in Cleveland, in which Sanders was a threat to no one. Defendant Lourie was untrained, apparently having never fired a beanbag rifle before that day, and fired with poor visibility at an excessive range. He fired at John Sanders without provocation or any justification in terms of protecting persons or property. Deputy Lourie treated Plaintiff Sanders like a firing-range target. Lourie's senseless violence deprived Sanders of his eye.

EXHIBIT A

## II.     JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Defendants under R.C. 2305.01 and venue is proper in this Court under Civ. R. 3(B)(3) because the events giving rise to Plaintiffs' claims took place in Cuyahoga County, Ohio.

## III.     PARTIES

4.     Plaintiff John Sanders was a resident of Erie County, Ohio during all times relevant to this action. He brings this action on his own behalf for damages resulting from the violation of rights secured by the United States Constitution and the laws of the State of Ohio.

5.     Defendant Cuyahoga County is an Ohio political subdivision responsible for the Cuyahoga County Sheriff's Department.

6.     Defendant Armond Budish is the Cuyahoga County Executive. At all times relevant to this complaint, he was responsible for the Sheriff's Department and its actions and was acting under color of state law. Budish has held the position of County Executive since January 1, 2015.

7.     Defendant David G. Schilling, Jr. ("Schilling") was the Interim Cuyahoga County Sheriff on May 30, 2020, a position he had held since August 2019. At all times relevant to this complaint, he was responsible for the Sheriff's department and its actions and was acting under the color of state law.

8.     Defendant Shane Alex Pellom ("Pellom") was the Cuyahoga County Safety Services Director at all relevant times, was responsible for the actions of the Cuyahoga County Sheriff's Department and its actions, and was acting under the color of state law. Pellom has held the position as Safety Services Director from November 2018.

9.     Defendant Deputy Sheriff Bruce Lourie ("Lourie"), at all relevant times, was a Deputy Sheriff with the Cuyahoga County Sheriff's office and was acting under the color of state law. Lourie was hired as Deputy Sheriff in December 2001

EXHIBIT A

## IV. FACTS

### A. The context of the May 30, 2020 protests

10.     On March 13, 2020, the Louisville police battle rammed Breonna Taylor's door on a no-knock warrant and murdered the young Black emergency-room technician. Breonna was shot at least eight times by police.

11.     On May 25, 2020 in Minneapolis, Minnesota, George Floyd, a Black man, was murdered by police.

12.     Derek Chauvin, a white police officer, knelt on George Floyd's neck for 9 minutes and 29 seconds. George Floyd pleaded for his life repeatedly stating, "I can't breathe." Witnesses also begged for Chauvin to remove his knee from Floyd's neck. Each of the officers involved ignored cries to stop and sadly, George Floyd died.

13.     George Floyd's death sparked pain and outrage around the entire world.

14.     As a result of the systemic racism in police departments nationwide and the unjustifiable killings of Black people at the hands of police in the United States, protests erupted worldwide.

15.     On May 30, 2020, protests to end police brutality assembled in the City of Cleveland. The City of Cleveland both expected and had advanced notice of the protests.

16.     The First Amendment to the United States Constitution guarantees the right to peacefully criticize the government through lawful and symbolic speech.

17.     The First Amendment also prohibits a public official from retaliating against an individual exercising his or her First Amendment rights.

18.     The Fourth Amendment to the United States Constitution guarantees the right to be free from excessive force by police.

EXHIBIT A

19.     Cuyahoga County has adopted customs, policies, patterns, and practices of abusing its officers' powers over citizens, both free and incarcerated, failing to properly train its employees with only the most minimal of policies regarding the use on non-lethal force, and has virtually no policies regarding crowd control and support for peaceful demonstrations. The injuries inflicted upon Sanders were part and parcel of a long history of inhumane treatment of citizens by the Cuyahoga County Sheriff's Department and its officers. While this history starts inside of the misnomered Cleveland Justice Center and Jail, on May 30, 2020, it extended to the citizens outside of the jail's walls. Because the Cuyahoga County Sheriff's Department's inhumane treatment of human beings has long been evidenced through the failure of the county jail to provide even a modicum of protection to its inmates, that history is set forth below as a predicate to what occurred on May 30, 2020.

**B. Plaintiff Sanders's peaceful, law-abiding conduct on May 30, 2020**

20.     On May 30, 2020, Plaintiff John Sanders went from his home in Sandusky to Cleveland with a group of friends and acquaintances to engage in a peaceful protest and share their voice in opposition to the repeated killings of unarmed Black Americans at the hands of law enforcement, and generally to express solidarity with fellow citizens calling for an end to racial discrimination. He went to Cleveland to exercise his First Amendment rights only to be met with Defendants' deprivation of his Fourth Amendment rights.

21.     Late on the afternoon of May 30, 2020, after having peacefully protested for several hours, John Sanders was on his way back to meet his friends and eventually travel back to Sandusky. As he passed by the Justice Center, and being an amateur photographer, he saw a scene that attracted his interest but cost him his eye. He crossed the street to the east/west side of the Justice Center to take pictures. As he crossed back over the street, clearly walking away from the Justice Center and with no one in his immediate area engaged in any violence, he was shot from the side

and back with a round from a beanbag rifle that exploded its metal pellets into his left eye, destroying it.

22.     Plaintiff brings this Civil Rights Action to secure fair compensation for his injuries, lost future wages, and for non-economic relief meant to discourage the Defendants from violating citizens' constitutional rights.

23.     The violation of Plaintiff's First and Fourth Amendment rights occurred because Defendants Cuyahoga County, County Administrator Budish, Sheriff Shilling, and Safety Services Director Pellom (the last three being the "Policymaking Defendants") failed to have adequate policies and procedures to ensure the protesters' constitutional rights were not violated, for failure to train and supervise, and for other particular reasons as alleged in this complaint.

24.     Instead of protecting Plaintiff's constitutional rights, Defendants Cuyahoga County and the Policymaking Defendants authorized and implemented unconstitutional policies regarding protesters exercising their First Amendment rights.

25.     The violation of Plaintiff's First and Fourth Amendment rights occurred because the Policymaking Defendants failed to supervise and train deputy sheriffs, including Deputy Lourie, not to retaliate or use excessive force against individuals exercising their First Amendment rights during protests.

26.     The training and supervision Policymaking Defendants provided was deliberately indifferent to the safety of citizens, including citizens like Plaintiff John Sanders.

27.     Policymaking Defendants' failures, especially when combined with the long history of sadistic, excessive force by Sheriff's Department employees at the County jail, constituted a pattern and practice, and a custom of tolerance, a custom of inaction, a custom of ratification and were the moving force behind the constitutional violations suffered by Plaintiff John Sanders.

28.     Following the events of May 30, 2020, Cuyahoga County Sheriff David Schilling released the Department's "After Action Report," dated October 5, 2020. Among the conclusions contained in the report was a determination "that CCSD deputies would benefit from additional training on issues resulting from responding to mass gatherings. CCSD personnel are currently participating in a Cuyahoga Community College training program for law enforcement. This is additional training on crisis intervention, de-escalation tactics, and managing emergency operation during mass gatherings, protests and riots."

29.     The Cuyahoga County Sheriff's Department's actions on May 30, 2020, using flash-bang devices, tear gas, and non-lethal weapons were deployed in such a way as to agitate rather than control the crowd. As many that day observed, it was the Sheriff's Department that was rioting, at least in part. The Department did so because it lacked a policy regarding how to approach crowd control so as to not exacerbate matters. For example, it is the policy of the Cleveland Division of Police that "when contemplating any use of force in a *civil disturbance* event, consideration should be given to what impact the use of force may have on the dynamics of the crowd, including the possibility of further agitating the group." Crowd Management and Munitions, page 3 (emphasis in original).

### C.  Deputy Bruce Lourie—unfit for law enforcement

30.     The Cuyahoga County Sheriff's Department conducted an incompetent and reckless review of Detective Lourie's background. Rather than vigorously examine his existing employment record, the Sheriff's Department recklessly took his prior colleagues' word for it, recklessly choosing not to verify anything. But his prior colleagues lied about his prior misconduct while employed by the Cleveland Metropolitan Housing Authority (CMHA). In fact, days before Detective Lourie applied for employment at the Cuyahoga County Sheriff's Department in 2001, he had been suspended under a last-chance agreement because of egregious misconduct involving dishonesty to a

superior officer, attempts to persuade colleagues to lie to cover for his misconduct, for his own dishonesty, and for abusing members of the public and falsely accusing an arrested individual of a crime by planting evidence. Despite the seriousness of entrusting anyone with a badge and a gun, Defendants were reckless in their approach to hiring and retaining Lourie.

31.     On the same day that Defendant Lourie received his badge from the Sheriff's Department, the Sheriff's Department had him sign an authorization that permitted them to obtain his prior employment records. Responses to public-records requests to both the Sheriff's Department and the CMHA reveal that the Sheriff's Department recklessly never requested the records.

32.     Had the Sheriff's Department not been so recklessly indifferent to properly conducting the background search for Defendant Lourie, he would never have been employed by the Sheriff's Department—and thus in a position to harm Plaintiff Sanders. The reckless failure to request his prior employment records falls below the conduct that would reasonably expected of any law-enforcement agency.

**D.  Known dangers of beanbag rounds**

33.     Beanbag rounds have existed for many years. Their use is quite controversial and, even the manufacturer places strict limits on the circumstances in which the use of beanbag rounds is deemed appropriate.

**E.  Beanbag rounds may not be used to target the face or head**

34.     The specific risks of the use of beanbag rounds are well-known. Targeting the face or head can result in serious injury or death. As a result, the manufacturer's recommendation and most if not all law-enforcement agencies that have developed policies regarding the use of beanbag rounds require targeting the lower legs and prohibit firing at the face or head.

EXHIBIT A

### F.  Beanbag rounds should never be fired from an elevated position

35.     The manufacturer's recommendations and other law-enforcement policies, also prohibit the use of beanbag rounds from an elevated position because of the increased risk of striking the face or head. As the United Nations has stated, "the firing of kinetic impact projectiles from the air or from an elevated position, such as during an assembly, is likely to increase their risk of striking protestors in the head." 7.5.3 Guidance on Less Lethal Weapons in Law Enforcement, United Nations Human Rights Commissioner, 2020.

### G.  Beanbags should only be used between 20 and 50 feet

36.     Because of the inherent unpredictability of a path of a beanbag round, the manufacturer requires that the rounds be used at a distance of no more than 50 feet (and also at a distance of no less than 20 feet because of the unacceptable impact speed). Detective Lourie not only shot at Plaintiff from over 75 feet away, he also shot into the smoke caused by tear gas deployed by his colleagues in the Sheriff's Department.

### H.  Beanbag rounds should only be used in good visibility

37.     After Detective Lourie fired at John Sanders, his colleague Deputy Sheriff Defendant Juan Rodriguez, Jr. suggested that he take a break. Lourie did so and handed the beanbag shotgun to Detective Rodriguez. Detective Rodriguez reported that he took one shot, but then stopped because the smoke was too intense to identify a target.

### I.  Beanbag rounds should not be used like semi-automatic weapons

38.     As can be heard from the video and audio recording just before John Sanders was shot, Deputy Rodriguez was firing repeatedly, almost in an automated fashion. Again, various policies and the manufacturer itself prohibit such automatic engagement of these weapons, instead requiring law-enforcement officers to assess the situation and the target after each shot instead of firing repeatedly and indiscriminately into crowds.

EXHIBIT A

39.     While the Cuyahoga County Sheriff's Department does not have a policy specific to the use of beanbag shotguns, the Cleveland Division of Police does. The Cleveland Division of Police requires, in its policy titled "Use of Force—Intermediate Weapons" dated July 1, 2019 and numbered 2.01.04, that "[t]he beanbag shotgun shall only be deployed by qualified officers (Supervisors/SWAT officers)."

40.     The Cleveland Division of Police further requires that "[t]he beanbag shotgun may be deployed when a subject presents an imminent risk of serious physical harm to an officer or others, de-escalation and other force options have proven ineffective, and the subject is within a safe range of the beanbag shotgun."

41.     The Cleveland Division of Police Policy further provides that "[t]he optimal range for effective deployment while minimizing risk is 21-50 feet." "At over 50 feet, the effect and accuracy of the beanbag shotgun are diminished to the point that this option will not achieve its purpose."

42.     The policy of the Cleveland Division of Police further provides that when using the beanbag shotgun, "Supervisors **shall**…*avoid the body's chest, head, neck and groin.*" (Emphasis in original.)

43.     The Cleveland Division of Police further provides as its policy that Supervisors shall "[c]onsider each discharged beanbag round as a separate use of force that officers shall individually justify and report as objectively reasonable, necessary, and proportional."

### J.  Deputy Lourie was not trained to use beanbag shotguns

44.     The manufacturer and all other law-enforcement departments with policies regarding the use of beanbag rounds require that any user be certified so that they understand the proper range, the proper targets, when it is appropriate to use beanbag rounds, and the prohibition against launching from an elevated position.

45.     But Detective Lourie had none of this training. Indeed, it is evident from a body-camera recording that an unidentified colleague, possibly Defendant John Doe or Defendant Rodriguez, handed him the beanbag shotgun on the afternoon of May 30, 2020 and told him on the fly how to use the weapon, essentially to point and pull the trigger, with no other instructions regarding the proper use of the beanbag shotgun. But because the Cuyahoga County Sheriff's Department never developed a policy regarding the use of beanbag rounds or any other non-lethal munitions, and as revealed in the Cuyahoga County Sheriff's Department's October 5, 2020 after-action report, Deputy Rodriguez, too, did not know when and how it was appropriate to use the beanbag shotgun.

46.     Sheriff Schilling's October 5, 2020 "After Action Report" further noted that "[t]he department has added instructors to increase the number of deputies trained with [less lethal munitions and launchers]." "It was also determined that on May 30, three deputies deployed less lethal munitions that did not have the necessary certifications to operate the munitions they deployed. To address this, when the potential for less lethal deployment arises, supervisors assigned to SWAT and MFF [Mobile Field Force] will assign less lethal munitions directly to certified deputies under their command. That is, the Sheriff's Department faulted itself for not requiring that supervisors distribute less lethal weapons to those properly trained in their use.

### K. Deputy Lourie turned his bodycam off on May 30, 2020, again

47.     The Cuyahoga County Sheriff's Department has a bodycam policy that requires that deputies on duty place their camera on the "record" mode with few exceptions, none of which apply here.

48.     Specifically, the Cuyahoga County Sheriff Department's Body Worn Video Camera Policy, number 204, provides that the camera "shall be worn at all times during the deputy's or supervisor's assigned tour of duty. Deputies shall place their VWBC [body cam] in the 'On, Record'

EXHIBIT A

mode as soon as safely practicable before, but not limited to the following situations: …use of force incidents, whenever such recording can be done without compromising officer's safety….'" (Footnotes omitted.)

49.     Compounding the errors and misconduct by Deputy Rodriguez was the fact that his body camera was off on May 30, 2020—apparently a repeated problem for this officer, who the Sheriff's Department had previously disciplined on October 1, 2019 for similar misconduct. Most, if not all, of his colleagues had their body cameras on. It was and is well-known within the law-enforcement community that if one is about to engage in misconduct, it is better to choose the misconduct of leaving the body camera off than having other misconduct recorded. Deputy Rodriguez's choice to have his body camera off speaks to his attitude on May 30, 2020.

### L.  Cuyahoga County's failure to protect society with adequate policies

50.     Law-enforcement agencies create policies to think through and how to plan to protect society in probable. or at least possible, scenarios. Cuyahoga County is no stranger to civil protests and unrest and it was therefore incumbent on the County, the Sheriff's Department, Budish, Pellom, and Skilling to ensure that plans were developed to address these situations, to better protect officers and the public.

51.     The Cleveland Division of Police has had a policy in place since at least June 13, 2016, entitled regarding Crowd Management and the Protection of Constitutional Rights, setting forth that it is the policy of the Cleveland Division of Police:

> a.   "To ensure that all citizens are afforded their Constitutional First, Fourth and Fourteenth Rights. In brief, these protections involve citizens' rights to freedom of speech, peaceable assembly, freedom from unreasonable search and seizure, as well as protections against the depravation of a citizens' life, liberty, or property without due process of law and equal protection thereof."

EXHIBIT A

    b.   "That individuals and groups are guaranteed a right to organize and participate in peaceful First Amendment assemblies on the streets, sidewalks, and other public ways and spaces of the City of Cleveland, and to engage in First Amendment Assembly near to the object of their protest so they may be seen and heard."

    c.   "[T]he Division shall respond to the scene of First Amendment assemblies in order to preserve peace while protecting the Constitutional and statutory rights of people to assemble peacefully and exercise free speech."

    d.   "That all officers be trained annually in the Division's Use of Force Policy, the use of lethal and less lethal options for responding to resistance, and de-escalation techniques."

52.    By contrast to the Cleveland Division of Police, the Cuyahoga County Sheriff's Department has absolutely no policy regarding how to approach civil unrest. As noted by the Cleveland Division of Police in its After Action Review of the civil unrest on May 30, 2020, "Cleveland is a unique and diverse city. It cannot be assumed that our community will respond in the same way as other locations or jurisdictions when civil unrest occurs." Page 4 of report. Of course, Cleveland is the county seat at the heart of Cuyahoga County and what is true of Cleveland is equally true of Cuyahoga County. As the Cleveland Division of Police observed, "when planning for such gatherings (large protests), particularly those that seek to draw attention to the high profile and emotional events, the Division weighs the need to protect the participants against the need to be visible and provide general security. The Division also balances the rights of those to assemble peacefully with the rights of others to move freely on public roads and pedestrian ways." *Id.* The report continued by noting that "[u]ltimately, planning for such events is a culmination of information gathering and intelligence of members from the Cleveland community, event planners

EXHIBIT A

and multiple levels of law enforcement." In contrast, not only did Cuyahoga County lack a policy, it utterly failed to balance the rights of John Sanders against anything at all.

**M. The Sheriff's Department violated even its own inadequate supposed policies**

53.     The minimal use-of-force policy adopted by the Cuyahoga County Sheriff's Department briefly addresses the use of "Impact Weapons & Less Lethal Shotgun Munitions." Cuyahoga County violated this minimalist policy in several respects. The policy requires that "Deputies will be trained and certified in the use of approved impact weapons and must maintain certification." As noted, Deputy Lourie was untrained.

54.     The Cuyahoga County policy also requires that "Impact weapons will be used to control a combative subject as an intermediate use of force option...." There was nothing about John Sanders walking away from and past the Justice Center that could cause anyone to believe that he was "combative."

55.     Furthermore, the Cuyahoga County Use of Force Policy requires that "Authorized impact weapons are not to punish or intentionally inflict injury." There can be no other reason that Detective Lourie fired at John Sanders's head. The action was designed to cause injury. Deputy Lourie and other deputies derisively referred to the entire crowd as "rioters" when only a small number were involved in vandalism or other conduct that could cause them to be deemed rioters. Moreover, other eyewitness testimony of officers using the beanbag shotguns on May 30, 2020, indeed shortly after John Sanders was hit, witnesses describe a Deputy smiling at the subjects and shooting Emily Forsee and her boyfriend despite the fact that they too were engaged in no "combative" conduct.

**N. Deputy Lourie's colleague's account—neither credible nor exculpatory**

56.     In his postmortem report of what Deputy Rodriguez contemptuously describes as a "riot," and after having months and months to re-work the report—as to which counsel have been

advised no prior drafts are available—Deputy Rodriguez nonetheless gave a damning account of Deputy Lourie's conduct that day. Deputy Rodriguez claims that Deputy Lourie advised a large group of "rioters" to back away from the building and that he fired when they would not listen. He states "during the chaos Deputy Lourie accidentally shot a young unidentified black man in the back of the head with one of the beanbag rounds." No one observing the videotape of John Sanders being shot would contend that he was warned, that he was a rioter, or that he failed to comply with law enforcement's commands.

57.     Deputy Rodriguez states that he "asked Deputy Lourie if he needed a break and if so pass me the shot gun, and he did. I took his spot by the window and observed the large crowds of violent people in the street destroying the buildings across the street from where we were at (W. 3rd Street). I noticed some of the crowd approaching the building and I shouted repeatedly 'stand back stand back'!". Again, no one observing the videotape of John Sanders being shot could claim that he was part of a large crowd of violent people, that any warning to him was audible, that he was destroying buildings, or that he failed to follow the commands of law enforcement. Deputy Rodriguez continued by observing that "I wasn't comfortable firing the shotgun towards the crowd because of the smoke from the smoke bombs going off and the smoke bothering my vision, and the cloth mask that I was wearing. After I fired the shotgun I hand it back to Deputy Lourie." Deputy Lourie obviously felt no such constraints.

58.     Deputy Rodriguez also observed that Deputy Lourie was stuffing his pockets with extra beanbag rounds and repeatedly firing the shotgun.

"Deputy Lourie did also put extra rounds in his pants pocket just in case he needed them for later he told me."

59.     Despite knowing the harm caused to John Sanders by untrained deputies using beanbag rounds, immediately after the protest and plaintiff's injuries, the Cuyahoga County's SWAT

commander doubled down on the beanbag rounds and ordered another 400 on June 3, 2020. Just like Deputy Lourie stuffed his pockets full, the SWAT team followed suit.

## V. Claims

### Claim 1
### Civil Action for Damages for Criminal Acts Under R.C. 2307.60(A)(1) (Against Defendant Lourie)

60. Plaintiff incorporates all previous allegations.

61. The conduct complained of above constitutes criminal acts on the part of Defendant Lourie. The crimes include, but are not limited to,

    a. felonious assault (R.C. 2903.11(A)(1));

    b. assault (R.C. 2903.13(A));

    c. interfering with civil rights (R.C. 2921.45(A)), including but not limited to

        i. the right to be free of excessive force under the Fourth and Fourteenth Amendments to the U.S. Constitution;

        ii. the right to be free of retaliation and prior restraint under the First and Fourteenth Amendments to the U.S. Constitution for Mr. Sanders exercising his right to protest;

        iii. the right to equal protection of the laws under the Fourteenth Amendment to the Constitution, which Lourie violated because Mr. Sanders is Black and was engaged in a Black Lives Matter protest;

    d. unlawful restraint (R.C. 2905.03(A)); and

    e. intimidation (R.C. 2921.03(A)).

62. As a direct and proximate result of this Defendant's intentional, knowing, and purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Sanders's rights, Mr. Sanders has suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to physical, mental, emotional, pain and suffering, as well as punitive damages.

63. This Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

EXHIBIT A

## CLAIM 2
### CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)
### (AGAINST DEFENDANTS BUDISH, SCHILLING, AND PELLOM)

64. Plaintiff incorporates all previous allegations.

65. The Policymaking Defendants each were instrumental in helping to create the culture of violence and deliberate indifference that resulted in Mr. Sanders and so many others suffering punitive brutality at the hands of Cuyahoga County Sheriff's Department deputies like Lourie.

66. Each of the Policymaking Defendants facilitated civil-rights violations in the Department. Each implicitly or explicitly authorized, approved, and knowingly acquiesced to the unconstitutional conduct described by—time and again—failing to meet the most basic obligations to operate law enforcement operation in a manner where people are treated with decency and respect, and where deputies are properly trained and supervised. Rather, Sheriff's personnel were supplied with circumstances and/or weapons in which they could and did fail to treat people, including Johns Sanders, as human beings. They were regularly brutalized by staff without consequence.

67. The use of force against Mr. Sanders was no isolated incident. The Policymaking Defendants allowed excessive use of force to flourish in the Sheriff's Department. Other supervisory personnel participated in fostering a brutal environment. In one use-of-force event after another, supervisors intentionally chose not to take appropriate steps to remedy constitutional violations, with the implicit approval of supervisors. These men encouraged each specific incident of violent misconduct by failing to appropriately address the acts of violence that preceded it. They also encouraged staff to cover for each other and lie to protect each other to the detriment of anyone who might dare to complain about being brutalized.

68. Because of the actions and inactions of the Policymaking Defendants at all relevant times, excessive use of force is deeply entrenched in the Cuyahoga County Sheriff Department's culture, as current sheriff David Shilling's comments to media on January 24, 2020 (following former

EXHIBIT A

Corporal Idris-Farid Clark's entry of his plea bargain in the criminal case brought for his attack on

Sheriff's detainee Chantelle Glass) confirm:

> Reporter Paul Orlousky: "Is the staff willing to change?"
>
> Sheriff Shilling: "Yeah, I'm encouraged by it, Paul. The staff is on
> board. Naturally it's getting that buy-in from them."

69.    Despite knowledge of a variety of serious problems within the Department, the

Policymaking Defendants allowed the constitutional violations to continue.

70.    Defendant Budish knew about the problems in the Cuyahoga County Sheriff's

Department and failed to take appropriate steps to ensure that citizens' constitutional rights were not

violated.

71.    Defendant Schilling knew about the problems in the Department and failed to take

appropriate steps to ensure that citizens' constitutional rights were not violated.

72.    Defendant Pellom knew about the problems in the Department and failed to take

appropriate steps to ensure that citizens' constitutional rights were not violated.

73.    This deliberate indifference included failing to train staff about their constitutional

obligation to intervene to prevent colleagues from using excessive force against citizens.

74.    The conduct complained of above constitutes criminal acts on the part of the named

Defendants. The crimes include, but are not limited to, interfering with civil rights, including but not

limited to the right to expect Defendants to train and supervise Sheriff's Department personnel to

keep citizens free of excessive force under the Fourth and Fourteenth Amendments, free from

retaliation and prior restraint under the First and Fourteenth Amendments to the U.S. Constitution,

and free from race discrimination under the Fourteenth Amendment's Equal Protection Clause

(R.C. 2921.45(A));

75.    As a direct and proximate result of these Defendants' intentional, knowing, and

purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr.

EXHIBIT A

Sanders's rights, Mr. Sanders has suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

76.     These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

### CLAIM 3
### CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)
### (AGAINST DEFENDANT JOHN DOE)

77.     Plaintiff incorporates all previous allegations.

78.     Defendant John Doe handed Defendant Lourie the weapon that Lourie used to take out Mr. Sanders's eye. He failed to train or supervise Lourie in the use of the weapon. He encouraged Lourie to shoot without any training, discretion, or discrimination.

79.     The conduct complained of above constitutes criminal acts on the part of the named Defendant. The crimes include, but are not limited to,

    a.   complicity (including but not limited to aiding and abetting) under R.C. 2923.03 to commit felonious assault (R.C. 2903.11(A)(1)); assault (R.C. 2903.13(A)); interference with civil rights (R.C. 2921.45(A), including but not limited to the right be free of excessive force, to expect Defendants to train and supervise Sheriff's Department personnel to keep citizens free of excessive force under the Fourth and Fourteenth Amendments, free from retaliation and prior restraint under the First and Fourteenth Amendments to the U.S. Constitution, and free from race discrimination under the Fourteenth Amendment's Equal Protection Clause); unlawful restraint (R.C. 2905.03(A)); and intimidation (R.C. 2921.03(A)); and

EXHIBIT A

    b.   dereliction of duty (R.C. 2921.44(A)(2)) for negligently failing to prevent or halt the commission of an offense or to apprehend an offender, when it is in the law enforcement officer's power to do so alone or with available assistance.

80.    As a direct and proximate result of these Defendants' intentional, knowing, and purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Sanders's rights, Mr. Sanders has suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to mental, emotional, and physical pain and suffering, as well as punitive damages.

81.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 4
### CIVIL ACTION FOR DAMAGES FOR CRIMINAL ACTS UNDER R.C. 2307.60(A)(1)
### (AGAINST DEFENDANT RODRIGUEZ)

82.    Plaintiff incorporates all previous allegations.

83.    The conduct complained of above constitutes criminal acts on the part of Defendant Lourie. The crimes include, but are not limited to, dereliction of duty (R.C. 2921.44(A)(2)) for negligently failing to prevent or halt the commission of an offense by Defendant Lourie or to apprehend an offender, namely Lourie, when it was in the law-enforcement officer's (Rodriguez's) power to do so alone or with available assistance, for Lourie's crimes described above.

84.    As a direct and proximate result of this Defendant's intentional, knowing, and purposeful criminal conduct, which showed a spirit of ill-will, hatred, and wanton disregard of Mr. Sanders's rights, Mr. Sanders has suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to physical, mental, emotional, pain and suffering, as well as punitive damages.

EXHIBIT A

85.     This Defendant's acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendant and others from engaging in this type of unlawful conduct.

## CLAIM 5
## BATTERY
### (Against Defendant Lourie)

1.     Plaintiff incorporates all previous allegations.

2.     Defendant Lourie engaged in the above-described actions intending to cause the harmful contact and the harmful contact resulted. Lourie intended to hit Mr. Sanders with the projectile. These offensive touchings were unlawful and unwanted.

3.     As a direct and proximate result of Lourie's unlawful conduct, which was intentional and showed a spirit of ill-will, hatred, and wanton disregard of Mr. Sanders's rights, Mr. Sanders suffered and will continue to suffer physical, economic, and non-economic damages for which Lourie is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

4.     Mr. Sanders is entitled to punitive damages based on Defendant Lourie's unlawful conduct.

## CLAIM 6
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Lourie)

5.     Plaintiff incorporates the previous allegations by reference.

6.     Defendant Lourie's attack on Mr. Sanders was extreme and outrageous and constituted behavior that is intolerable in a civilized community.

7.     Defendant Lourie's attack on Mr. Sanders was undertaken knowingly and intentionally, with malice, with a conscious disregard of Mr. Sanders's rights and interests, and with certainty of inflicting severe harm and damage on Mr. Sanders.

8.     Defendant Lourie's attack on Mr. Sanders was intentional, was intended to cause, and did directly and proximately cause Mr. Sanders to suffer severe and debilitating emotional harm and damage, including anxiety, depression, and sleeplessness.

EXHIBIT A

9.      The mental anguish suffered by Mr. Sanders as a direct and proximate result of Defendant Lourie's conduct is serious and of a nature that no reasonable person could be expected to endure it.

10.     Defendant Lourie knew or should have known that Mr. Sanders would suffer severe harm and damage because of his conduct.

11.     Mr. Sanders is entitled to punitive damages based on Defendant Lourie's unlawful conduct.

### CLAIM 7
### RECKLESS HIRING, TRAINING, SUPERVISION, DISCIPLINE, STAFFING, AND RETENTION
### (against Cuyahoga County)

1.      Plaintiff incorporates the previous allegations by reference.

2.      Defendant Cuyahoga County failed to exercise due care and acted in a willful, wanton, and reckless manner in hiring, training, supervising, disciplining, staffing, and retaining Defendants Lourie, Rodriguez, and John Doe as Deputy Sheriffs.

3.      Cuyahoga County knew that they were unfit for their positions and duties, yet tolerated their employment.

4.      Cuyahoga County's reckless, wanton, and willful conduct in this regard directly and proximately caused Mr. Sanders's injuries alleged in this Complaint.

### VI. PRAYER FOR RELIEF

For the reasons stated, Mr. Sanders respectfully requests the following relief from the Court:

A.      Declare that Defendants' acts and conduct constitute violations of the Fourteenth Amendment to the United States Constitution, as well as of 42 U.S.C. § 1983 and state law;

B.      Enter judgment in Mr. Sanders's favor on all claims for relief;

C.      Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Mr. Sanders has suffered and is reasonably certain to suffer in the future;

D.      Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

EXHIBIT A

E.      Award pre- and post-judgment interest at the highest lawful rate;

F.      Award Mr. Sanders his reasonable attorneys' fees and all other costs of suit; and

G.      Award all other relief in law or equity, including injunctive relief, to which Mr. Sanders is entitled and that the Court deems equitable, just, and proper.

## VII. Jury Demand

Mr. Sanders demands a trial by jury on all issues within this complaint.

Dated: May 29, 2021

/s/ Subodh Chandra
Subodh Chandra (0069233)
Donald P. Screen (0044070)
Patrick Haney (0092333)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West Sixth Street, Suite 400
Cleveland, Ohio 44113
216.578.1700 (p) /216.578.1800 (f)
Subodh.Chandra@ChandraLaw.com
Donald.Screen@ChandraLaw.com
Patrick.Haney@ChandraLaw.com

Respectfully submitted,

/s/ per consent
Dennis E. Murray, Jr. (0038509)
MURRAY & MURRAY CO., L.P.A.
111 East Shoreline Drive
Sandusky, Ohio 44870-2517
(419) 624-3126 (p) / (419) 624-0707 (f)
dmj@murrayandmurray.com

*Attorneys for Plaintiff John Sanders*